Christopher B. Dolan, Esq. (SBN 165358)
Lourdes DeArmas, Esq. (SBN 210167)
**DOLAN LAW FIRM, PC**
1438 Market Street
San Francisco, California 94102
Telephone: (415) 421-2800
Facsimile: (415) 421-2830

Attorneys for Plaintiff,
SARAH PALLESON

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SARAH PALLESON,<br><br>                    Plaintiff,<br><br>          v.<br><br>BOSTON SCIENTIFIC CORPORATION,<br><br>                    Defendant. | CASE NO.: '21 CV 1037 MMA RBB<br><br>**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**<br><br>1.  **Strict Liability – Failure to Warn**<br>2.  **Strict Liability – Manufacturing Defect**<br>3.  **Negligence**<br>4.  **Negligent Misrepresentation** |

All allegations in this Complaint are based upon information and belief except for those allegations which pertain to the Plaintiff named herein and her counsel. Each allegation in this Complaint either has evidentiary support or is likely to have evidentiary support after reasonable opportunity for further investigation and discovery. Plaintiff, for her causes of action against the Defendant, alleges as follows:

## NATURE OF CASE

1.      Plaintiff Sarah Palleson by her undersigned counsel, brings this Complaint against Defendant Boston Scientific Corporation related to the design, manufacture, marketing,

1



distribution and sale of Defendant's polypropylene Obtryx Mesh Product Transobturator Mid-urethral Sling System ("Mesh Product") that was implanted in Sarah Palleson thereby causing significant physical injuries, pain and suffering. This action is for compensatory, equitable, injunctive, and declaratory relief. Plaintiff makes the following allegations based upon her individual personal knowledge as to her own acts, and upon information and belief, as well as upon her attorneys' investigative efforts as to Defendant's actions and misconduct and alleges as follows.

## **PARTIES, JURISDICTION & VENUE**

2.      Plaintiff Sarah Palleson ("Ms. Palleson" or "Plaintiff") is a citizen of Ramona, San Diego County, California.

3.      Defendant Boston Scientific Corporation ("BSC" or "Defendant") is a Delaware corporation with its corporate headquarters in Massachusetts. Defendant is registered to do business in the state of California. All acts and omissions of Boston Scientific Corp. as described herein were done by its representatives, agents, servants, employees and/or owners, acting in the course and scope of their respective positions, agencies, services, employments and/or ownership.

4.      Federal subject matter jurisdiction in this action is based upon 28 U.S.C. § 1332(a), in that there is complete diversity among Plaintiff and Defendant and the amount in controversy exceeds $75,000.

5.      Venue is proper in this district pursuant 28 U.S.C. § 1391(a) as a substantial part of the events and omissions giving rise to Plaintiff's causes of action occurred in this U.S. federal judicial district.

6.      Defendant is subject to *in personam* jurisdiction in the U.S. District Court for the Southern District of California because Defendant placed its defective product in the stream of commerce and its product was implanted into and caused personal injures to Plaintiff Sarah Palleson, a resident of Ramona, San Diego County, California. The defendant also has



2

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

significant contacts and regularly does business in California, specifically within this federal judicial district such that they are subject to the personal jurisdiction of the Court in this U.S. district.

## STATUTE OF LIMITATIONS

7.      Plaintiff was implanted with Mesh Product on November 5, 2009 at Scripps Memorial Hospital in La Jolla, California.

8.      Subsequent to the implantation, Plaintiff began to experience painful bladder, bleeding, and inability relieving her bladder. She sought consultations and underwent examinations by her treating physicians. At no time did any of Plaintiff's treating physicians inform her that her symptoms were related to the Product. Plaintiff was informed that her symptoms were not related to the Product and were, instead attributed to urinary infections, interstitial cystitis, and/or nerve entrapment/impingement unrelated to Mesh Product. On the basis of the information Plaintiff received from her treating physicians, Plaintiff reasonably did not suspect or have reason to suspect that the wrongful cause of her injuries was the Product.

9.      Plaintiff could not have reasonably discovered the occasion, manner and/or means by which Defendant's breach of duty occurred until within one year of the filing of this complaint.

10.     Further, Plaintiff did not and, despite exercising reasonable diligence, including consultation with medical professionals, could not discover the existence of her legal cause of action or the injuries caused by Defendant's breach of duty and/or defective products until within one year of the filing of this complaint.

11.     Defendant continues to deny that their products are defective or cause injuries such as those suffered by Plaintiff and Defendant continues to manufacture, market, and sell the product at issue and other like devices. Any applicable statute of limitations has been tolled by the knowing and active concealment and denial of material facts known by Defendant when Defendant had a duty to disclose.

12.     Neither Plaintiff nor her healthcare providers were warned that the Mesh Product were unreasonably dangerous, even when used as intended by Defendant. To the contrary,



Defendant promoted, marketed and sold the type of transvaginal mesh devices implanted in Plaintiff (and thousands of women like Plaintiff) to healthcare providers as a safe alternative to other procedures and safer alternative polypropylene devices used for stress urinary incontinence that did not incorporate the Defendant's products.

13.     Despite diligent investigation by Plaintiff into the cause of her injuries, including consultations with her medical providers, the nature of Plaintiff's injuries and damages, and their relationship to the Product was not discovered, and through reasonable care and due diligence could not have been discovered, until a date within the applicable statute of limitations for filing Plaintiff's claims.

## **FACTUAL BACKGROUND**

14.     Defendant developed, designed, licensed, advertised, delivered, manufactured, packaged, labeled, marketed, sold, and distributed its pelvic mesh product Obtryx Transobturator Mid-urethral Sling System (the "Mesh Product" or "Obtryx") which was implanted in Plaintiff.

15.     Defendant's pelvic mesh products, including the Obtryx, contain monofilament polypropylene mesh and are used to treat pelvic organ prolapse and stress urinary incontinence. Despite claims that polypropylene is inert, the scientific evidence shows that this material as implanted in Plaintiff is not inert but is biologically incompatible with human tissue and promotes a negative immune response in a large subset of the population implanted with pelvic mesh products, including the Mesh Product.

16.     BSC used Marlex® HGX-030-01 Polypropylene Homopolymer resin in its transvaginal mesh kits, both pelvic organ prolapse kits and sling systems. The Marlex® resin was manufactured by Phillips Sumika Polypropylene Company, ("Phillips") a joint venture between Chevron Phillips Chemical Company, LP, and Sumitomo Chemical.

17.     Marlex HGX-030-01 resin is a polypropylene plastic that comes in the form of pellets. For several years, Phillips issued revised Material Safety Data Sheets ("MSDS") for Marlex polypropylene. BSC was aware of the Marlex MSDS at all relevant times, including when



**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

it manufactured and marketed its Products to the public, including Plaintiff and her physicians.

18.   The Marlex MSDS expressly prohibits use of the material for permanent human implantation:

> MEDICAL APPLICATION CAUTION: DO NOT USE THIS CHEVRON PHILLIPS CHEMICAL MATERIAL IN MEDICAL APPLICATIONS INVOLVING PERMANENT IMPLANTATION IN THE HUMAN BODY OR PERMANENT CONTACT WITH INTERNAL BODY FLUIDS OR TISSUES.
>
> DO NOT USE THIS CHEVRON PHILLIPS CHEMICAL COMPANY LP MATERIAL IN MEDICAL APPLICATIONS INVOLVING BRIEF OR TEMPORARY IMPLANTATION IN THE HUMAN BODY OR CONTACT WITH INTERNAL BODY FLUIDS OR TISSUES UNLESS THE MATERIAL HAS BEEN PROVIDED DIRECTLY FROM CHEVRON PHILLIPS CHEMICAL COMPANY LP UNDER AN AGREEMENT WHICH EXPRESSLY ACKNOWLEDGES THE CONTEMPLATED USE.
>
> CHEVRON PHILLIPS CHEMICAL COMPANY LP MAKES NO REPRESENTATION, PROMISE, EXPRESS WARRANTY OR IMPLIED WARRANTY CONCERNING THE SUITABILITY OF THIS MATERIAL FOR USE IN IMPLANTATION IN THE HUMAN BODY OR IN CONTACT WITH INTERNAL BODY FLUIDS OR TISSUES.

19.   On October 1, 2004, Phillips Sumika Polypropylene Company (PSPC) entered a one-year stand-alone indemnification/insurance agreement which waived the company's liability for BSC's decision to use the polypropylene material in medical applications. That agreement included the following language for BSC's use of the resin material in its transvaginal mesh products:

> BEFORE USING ANY PSPC POLYPROPYLENE PRODUCT, BOSTON SCIENTIFIC IS ADVISED AND CAUTIONED TO MAKE ITS OWN DETERMINATION AND ASSESSMENT OF THE SAFETY AND SUITABILITY OF THE PSPC POLYPROPYLENE PRODUCT FOR USE BY, FOR OR ON BEHALF OF BOSTON SCIENTIFIC. IT IS THE ULTIMATE RESPONSIBILITY OF BOSTON SCIENTIFIC TO ENSURE THAT THE PSPC POLYPROPYLENE PRODUCT IS SUITED TO BOSTON SCIENTIFIC'S SPECIFIC APPLICATION.

20.   The 2004 Indemnity Agreement placed the burden on Boston Scientific to conduct any and all necessary testing to ensure that the product they marketed with Marlex resin was safe for its intended use. Boston Scientific performed no long-term safety studies on the dangers

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

associated with the permanent implantation of its Mesh Product sling. Subsequent to this 2004 indemnity agreement, in September of 2005, Phillips decided not to renew its contract with Boston Scientific because the resin was not intended for use in permanent implant devices. Per the terms of the 2004 contract between the two companies, Boston Scientific decided to exercise a right it held to make a "last-time" buyout before the contract was terminated. In 2005, BSC purchased 4,000 pounds of Marlex® HGX-030-01, the equivalent of a 10-year supply.

21.     Synthetic materials like polypropylene, including that used by BSC, are known to induce an acute inflammatory response, followed by chronic inflammatory response and foreign-body reaction. A chronic inflammatory response and heightened foreign body reaction have the potential to result in failure of the device to perform safely and effectively, with significant adverse consequences for the patient. Further, a prolonged inflammatory response exposes the polypropylene mesh to a continuous bath of oxidants that may cause in vivo degradation of the mesh.

22.     The polypropylene MSDS specifies that polypropylene may react with strong oxidizing agents. Despite the known warnings, contraindications, and complications, BSC utilized Marlex in a manner that had never been qualified by the supplier for permanent human implantation for a medical application that was disallowed according to the Material Safety Data Sheet (MSDS) in its manufacture of the Mesh Product.

23.     The polypropylene mesh used by Defendant for their Pelvic Mesh Products also contracts as a result of the development of scar tissue exacerbated by the foreign body reaction. Polypropylene mesh is known to shrink by up to over 50% during healing. When the transvaginal mesh shrinks during the normal healing process, the arms of the mesh pull on their anchoring points in the pelvic sidewall muscles, tending to pull these anchoring points and the attached muscle toward the midline. In women with these transvaginal mesh implants, including Plaintiff herein, this pulling on the pelvic sidewall muscles causes pain at rest, during sexual intercourse, during defecation, and during normal daily activities like coughing, jumping and straining. This aggravated pulling will cause new or worsening pain to the women in whom the product is implanted. In addition, it is well established that nerves can become entrapped as a result of the

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**



chronic inflammatory response and fibrosis surrounding the mesh.

24. The negative response to polypropylene promotes inflammation of the pelvic tissue and can contribute to the formation of severe adverse reactions to the mesh, including:

      a. The formation of scar tissue;

      b. Ongoing scarification;

      c. Mesh contraction;

      d. Ongoing chronic inflammation related to chronic foreign body reactions; mesh degradation exacerbated by chronic infections and bio-films;

      e. Deformation of the mesh;

      f. Loss of pore size with tension;

      g. Fibrotic bridging leading to scar plate formation and mesh encapsulation; and

      h. Shrinkage/contraction of the encapsulate mesh.

25. When pelvic mesh products, including the Obtryx, are inserted in the female body according to the manufacturers' instructions, it creates a non-anatomic condition with mechanical mismatch in the pelvis leading to a multitude of injuries including, but not limited to, the possibility of multiple erosions that can occur throughout one's lifetime, chronic and debilitating pelvic, vaginal, groin and leg pain, recurrence, worsening incontinence, chronic dyspareunia, injury or irritation of the obturator, pudendal and other pelvic nerves, injury or irritation of the muscles and soft tissues of the pelvis, wound infection, rejection of the mesh, tissue necrosis and irritation, sexual dysfunction, urinary and defecatory dysfunction, vaginal scarring, wound healing problems, injury to urethra, pelvic abscess formation, hematoma, risk of infection, and/or the need for additional surgeries, among others. As a result, Defendant's Mesh Product is not suitable for its intended application as a permanent prosthetic implant for stress urinary incontinence in women.

26. Surgical mesh products have been used to repair abdominal hernias since the 1950s. In the 1970s, gynecologists began using surgical mesh products that were designed for hernia repair for abdominal repair to surgically repair prolapsed organs. In the 1990s, gynecologists began using this surgical mesh for the surgical treatment of pelvic organ prolapse



7

("POP") and stress urinary incontinence ("SUI").

27.     In 1996, the U.S. Food and Drug Administration (FDA) cleared the first pelvis mesh products for use in the treatment of SUIs. These products included products manufactured, marketed, and distributed by Defendant. These products are approved by the FDA under the abbreviated 510(k) approval process.

28.     Section 510(k) provides for marketing of a medical device if the device is deemed "substantially equivalent" to other predicate devices marketed prior to May 28, 1976.  No formal review for safety or efficacy is required, and no formal review for safety or efficacy was ever conducted by Boston Scientific Corp. with regard to the Mesh Product.

29.     On July 13, 2011, the FDA issued a Safety Communication wherein the FDA stated that "serious complications associated with surgical mesh for transvaginal repair of POP are *not rare*" (emphasis in the original).

30.     The FDA Safety Communication also stated,

> *Mesh contraction* (shrinkage) *is a previously unidentified risk* of transvaginal POP repair with mesh that has been reported in the published scientific literature and in adverse event reports to the FDA…   Reports in the literature associate mesh contraction with vaginal shortening, vaginal tightening and vaginal pain. (emphasis in the original).

31.     In a December 2011 Joint Committee Opinion, the American College of Obstetricians and Gynecologists (ACOG) and the American Urogynecologic Society (AUGS) also identified physical and mechanical changes to the mesh inside the body as a serious complication associated with vaginal mesh, stating:

> There are increasing reports of vaginal pain associated with changes that can occur with mesh (contraction, retraction, or shrinkage) that result in taut sections of mesh…Some of these women will require surgical intervention to correct the condition, and some of the pain appears to be intractable.



**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

32.     The ACOG/AUGS Joint Committee Opinion also recommended, among other things, that "[p]elvic organ prolapse vaginal mesh repair should be reserved for high-risk individuals in whom the benefit of mesh placement may justify the risk."

33.     The injuries of Plaintiff, as will be more fully established in Discovery, are identical to those reported in the FDA Safety Communication and in the ACOG/AUGS Joint Committee Opinion.

34.     The FDA Safety Communication further indicated that the benefits of using transvaginal mesh products instead of other feasible alternatives did not outweigh the associated risks. Specifically, the FDA Safety Communication stated: "it is not clear that transvaginal POP repair with mesh is more effective than traditional non-mesh repair in all patients with POP and it may expose patients to greater risk."

35.     Contemporaneously with the Safety Communication, the FDA released a publication titled "Urogynecologic Surgical Mesh: Update on the Safety and Effectiveness of Transvaginal Placement for Pelvic Organ Prolapse" (the White Paper). In the White Paper, the FDA noted that the published, peer-reviewed literature demonstrates that "[p]atients who undergo POP repair with mesh are subject to mesh-related complications that are not experienced by patients who undergo traditional surgery without mesh."

36.     The FDA summarized its findings from its review of the adverse event reports and applicable literature stating that it "has NOT seen conclusive evidence that using transvaginally placed mesh in POP repair improves clinical outcomes any more than traditional POP repair that does not use mesh, and it may expose patients to greater risk." (Emphasis in original).

37.     The FDA White Paper further stated that, "these products are associated with serious adverse events…compounding the concerns regarding adverse events are performance data that fail to demonstrate improved clinical benefit over traditional non-mesh repair."

38.     In its White Paper, the FDA advises doctors to, *inter alia*, "[r]ecognize that in most cases, POP can be treated successfully without mesh thus avoiding the risk of mesh-related complications." The FDA concludes its White Paper by stating that it "has identified serious



**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

safety and effectiveness concerns over the use of surgical mesh for the transvaginal repair of pelvic organ prolapse."

39.     As is known to the Defendant, the risks associated with POP repair are the same as SUI repair. However, the data regarding the magnitude and frequency of these known risks are not as developed as the data on POP repair. The FDA recognized this, as demonstrated by its Section 522 Orders issued to manufacturers of pelvic mesh products used to treat SUI in January of 2012 and to date no study by Defendant provides reliable evidence of long-term safety for their products.

40.     In September 2011, the FDA acknowledged the need for additional data and noted in "Surgical Mesh For Treatment of Women with Pelvic Organ Prolapse and Stress Urinary Incontinence" that the literature and information developing on SUI repair with mesh "indicates that serious complications can occur…[and] a case can be made for additional premarket and/or post market studies to better address the risk/benefit of all mesh products used for SUI."

41.     After the 2011 FDA notification that mesh complications from POP repairs were "not rare," a 2013 article was published that stated: "as outlined in the FDA notifications, patients should be forewarned that some transvaginal mesh complications are life altering and might not always be surgically correctable."[1] Furthermore, that study noted that the women who received both MUS and TVM[2] represented a complicated surgical group. Of the 58 women, 36% had undergone initial mesh removal attempts before their referral to either tertiary institution, 29% required re-excision of residual mesh, 13 once and 4 twice, five women (7%) developed recurrent symptomatic pelvic organ prolapse, and the residual rate of dyspareunia and pelvic pain was 14% and 22%, respectively.

42.     Defendant did not, and have not, adequately studied the extent of the risks associated with their pelvic mesh products, including the Mesh Product. In January 2012, the

---

[1]     Lee D, Dillon B, Lemack G, Gomelsky A, Zimmern P. *Transvaginal mesh kits--how "serious" are the complications and are they reversible?.* Urology. 2013;81(1):43-48. doi:10.1016/j.urology.2012.07.098.

[2]     MUS: Mid-urethral sling; TVM: Transvaginal mesh.



**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

FDA recognized the risk to women and mandated additional studies to further investigate these risks

43.     Manufacturers, including the Defendant, began to modify the mesh used in hernia repair to be used as products specifically intended to correct POP and/or SUI. Today, Defendant sells pelvic mesh "kits" which can include not only the surgical mesh, but also tissue fixation anchors and insertion tools.

44.     The Mesh Product manufactured by Defendant Boston Scientific Corp. is considered a Class II medical device. On April 14, 2004 the Product was cleared (not approval) to market by the FDA under Section 510(k) of the Medical Device Amendment to the Food, Drug and Cosmetics Act and revised On September 13, 2013, to include indications for use in the treatment of SUI.

45.     On April 16, 2019, the FDA ordered all manufacturers of surgical mesh intended for transvaginal repair of anterior compartment prolapse (cystocele) to stop selling and distributing their products immediately. In fact, the FDA has determined that the manufacturers, Boston Scientific, has not demonstrated reasonable assurance of safety and effectiveness for these transvaginal mesh devices used in the treatment of pelvic organ prolapse, which is the premarket standard that now applies to them since the agency reclassified them into class III (high risk) in 2016.[3]

46.     The Defendant knew or should have known about the Mesh Product risks and complications identified in the FDA Safety Communication and the ACOG/AUGS Joint Committee Opinion.

47.     Defendant knew or should have known that the Mesh Product unreasonably exposed patients to the risk of serious harm while conferring no benefit over available feasible alternatives that do not involve the same risks.

---

[3]     U.S. Food & Drug Administration, *Urogynecological Surgical Mesh Implants*, http://www.fda.gov/medical-devices/implants-and-prosthetics/urogynecologic-surgical-mesh-implants (last visited May 31, 2020).



**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

48.     At the time Defendant began marketing the Mesh Product, Defendant was aware that the Product was associated with each and every one of the adverse events communicated by the FDA in its July 13, 2011, safety communication.

49.     The scientific evidence shows that the material from which the Mesh Product is made is biologically incompatible with human tissue and promotes a negative immune response in a large subset of the population implanted with the Mesh Product, including Plaintiff Sarah Palleson.

50.     This negative response promotes inflammation of the pelvic tissue and contributes to the formation of severe adverse reactions to the mesh, such as those experienced by Plaintiff.

51.     The FDA defines both "degradation" and "fragmentation" as "device problems" to which the FDA assigns a specific "device problem code."  "Material Fragmentation" is defined as an "[i]ssue associated with small pieces of the device breaking off unexpectedly" and "degraded" as an "[i]ssue associated with a deleterious change in the chemical structure, physical properties, or appearance in the materials that are used in device construction."

52.     The Mesh Product was unreasonably susceptible to degradation and fragmentation inside the body.

53.     Contrary to Defendant's assertions that its products are resistant to significant inflammation, infection or erosion:

   a.     Complications from mesh placement for pelvic organ prolapse include among other adverse events: acute and chronic infection, tissue contraction due to mesh shrinkage, erosion of the mesh into adjacent structures, and dyspareunia. [painful sexual intercourse].[4]

4     Cosson, M., et al., *Mechanical properties of synthetic implants used in the repair of prolapse and urinary incontinence in women: which is the ideal material?* Int Urogynecol J Pelvic Floor Dysfunct, 2003. 14(3): p. 169-78; discussion 178. Jones, K.A., et al., *Tensile properties of commonly used prolapse meshes*. Int Urogynecol J Pelvic Floor Dysfunct, 2009. 20(7): p. 847-53. Margulies, R.U., et al., *Complications requiring reoperation following vaginal mesh kit procedures for prolapse*. Am J Obstet Gynecol, 2008. 199(6): p. 678 el-4.



**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

b.   Erosion can be defined as the mesh wearing, or slowly grinding through the vaginal wall. This is a serious complication and moreover, there is evidence that meshes shrink in vivo leading to increased stiffness, pain and poor restoration of the normal properties of the vagina.[5]

c.   Larger pores within polypropylene mesh materials, allowing macrophage and leukocyte migration, reduce infection.[6]

54.   Defendant's pelvic mesh products, including the product at issue and its predecessor products, were and are unreasonably susceptible to degradation and fragmentation inside the body; shrinkage or contraction inside the body; intense foreign body reaction; chronic inflammatory response within and adjacent to the soft tissue and vital structures within the pelvis; chronic wound healing; chronic infections in and around the mesh fibers; nerve entrapment in the collagen scar formation; and traction injuries to nerves from collagen scar formation. Defendant knew or should have known of these serious risks and should have, therefore, warned physicians and patients regarding these risks; to the extent they were known or knowable.

55.   The Mesh Product was unreasonably susceptible to shrinkage and contraction inside the body. Defendant knew or should have known of this serious risk and warned physicians and patients, including Plaintiff and her treating physicians.

56.   The Mesh Product was unreasonably susceptible to "creep" or to gradual elongation and deformation when subject to prolonged tension inside the body.

57.   The Mesh Product has been and continues to be marketed by Defendant to the medical community and to patients as a safe, effective, and reliable medical device, implanted by safe, effective, and minimally invasive surgical techniques, and as safe and more effective as

---

5   Dora, C.D., et al., *Time dependent variations in biomechanical properties of cadaveric fascia, porcine dermis, porcine small intestine  submucosa, polypropylene mesh and autologous fascia in the rabbit model: implications for sling surgery.* J Urol, 2004. 171(5): p. 1970-3.
6   Birch C, Fynes MM. *The role of synthetic and biological prosthesis in reconstructive pelvic floor surgery.* Curr Opin Obstet Gynecol. 2002; 14:527-595. 22. Govier FE, Kobashi KC, Kozlowski PM, Kuznetsov DD, Begley SJ, McGonigle KF, et al. *High complication rate identified in sacrocolpopexy patients attributed to silicone mesh.* J Urol. 2005; 65:1099-1103.

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**



compared to available feasible alternative treatments of stress urinary incontinence, and other competing products.

58.     A woman who elects to have her SUI surgically treated has several options:

a.     SUI can be corrected through traditional abdominal surgery using sutures to attach the urethra to a ligament in the pelvis (known as the "Burch procedure") which eliminates polypropylene mesh related complications and is not associated with chronic, life altering, intractable pain.

b.     SUI can also be corrected by using an autologous sling with tissue harvested from the fascia of the abdominal wall or the tissue from the leg that eliminates polypropylene mesh related complications and is not associated with chronic, life-altering, intractable pain.

c.     SUI can also be surgically addressed using synthetic materials injected under the urethra to provide support.

d.     SUI can also be corrected by safer alternative designs of polypropylene mesh that do not present the same frequency or severity of risks as do the Mesh Product.

e.     POP can be corrected through abdominal or transvaginal surgery and using traditional suture repair, thereby avoiding mesh related complications with no significant change in efficacy.

f.     POP can also be corrected by transvaginal repair with biologic materials thereby reducing polypropylene mesh related complications with no significant change in efficacy.

g.     POP can also be repaired with abdominally synthetic materials, including polypropylene mesh devices, avoiding contamination of the polypropylene mesh material with bacteria from the vagina and reducing the  risk of neurological injury from blind placement or at best with limited visualization of the vaginal mesh polypropylene devices.



**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

59.     Defendant omitted and downplayed the risks, dangers, defects, and disadvantages of their products, including the Mesh Product, and advertised, promoted, marketed, sold and distributed the Mesh Product as a safe medical device when Defendant knew or should have known that the Mesh Product was not safe for its intended purposes, and that the Mesh Product would cause, and did cause, serious medical problems, and in some patients, including Plaintiff, catastrophic injuries. Further, while some of the problems associated with the Mesh Product were made known to physicians, the magnitude and frequency of these problems were not disclosed and were hidden from physicians.

60.     Contrary to Defendant's representations and marketing to the medical community and to the patients themselves, the Mesh Product has high rates of failure, injury, and complications, fails to perform as intended, requires frequent and often debilitating re-operations, and has caused severe and irreversible injuries, conditions, and damage to a significant number of women, including Plaintiff, making them defective under the law.

61.     The specific nature of the Mesh Product defects includes, but is not limited to, the following:

a.     The use of polypropylene in the Mesh Product and the immune reactions that result from such material, causing adverse reactions and injuries, including but not limited to, painful recurrent erosions and associated intractable pain;

b.     The design of the Mesh Product to be inserted blindly into and through an area of the body that is blood vessel rich, nerve dense, with high levels of bacteria that can adhere to the mesh causing immune reactions and subsequent tissue breakdown and adverse reactions and injuries, including but not limited to, excessive blood loss and vascular damage, permanent nerve injury and associated chronic, intractable neuropathic pain. The contaminated permanently-implanted mesh will cause chronic infections and biofilms, and will enhance the chronic inflammatory response—leading to chronic wound healing with tissue destruction, as well as numerous other adverse reactions and

15

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

serious and permanent injury to the soft tissues, nerves, and vital structures of the pelvis;

c.     Biomechanical issues with the design of the Mesh Product, including but not limited to, the propensity of the Mesh Product to contract or shrink inside the body, that in turn causes surrounding tissue to be eroded because of mechanical mismatch between soft tissues and the mesh, inflamed, fibrotic, and contract, resulting in serious, permanent injury, and ongoing injury to the soft tissue, nerves, and vital structures of the pelvis;

d.     The use and design of arms of the Mesh Product, which, when placed in the women, are likely to pass through contaminated spaces and that can injure muscles, vascular structures, and major nerve routes in the pelvic region acutely and overtime;

e.     The propensity of the Mesh Product to deform and "creep", or to gradually elongate when subject to prolonged tension both during implantation and once implanted inside the body, causing the mesh, or portions thereof, to become encapsulated and contract in a rigid scar plate thereby leading to nerve entrapment, nerve traction, bacterial entrapment, tissue destruction, enhanced inflammatory and fibrotic response of soft tissue leading to chronic pain from muscle damage or irritation and chronic pain from nerve damage or irritation;

f.     The inelasticity of the Mesh Product which is potentiated by the negative immune response, degradation, and encapsulation by scar tissue creates a mechanical mismatch between the mesh and the delicate, sensitive areas of the vagina and pelvis where the product is implanted, thereby causing pain upon normal daily activities that involve movement in the pelvic region (e.g. intercourse, defecation, walking);

g.     The propensity of the Mesh Product for degradation or fragmentation over time, which causes an increased surface area that leads to enhanced chronic inflammatory and fibrotic reaction, a "barbed wire" or "saw blade" effect as a



**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

result of the fragmented surface "sawing" through the tissue and leading to bacteria harboring in the fragmented, peeled and split fiber surface, which in turn leads to chronic infections a the mesh surface, and results in continuing injury over time to the soft tissue, nerves, and vital structures of the pelvis;

h.   The creation of a non-anatomic condition in the pelvis leading to chronic pain and functional disabilities when the mesh is implanting according to the manufacturers' instructions; and

i.   The inability of surgeons to effectively treat many of these conditions due to the integration of the mesh into the pelvic tissue and preventing the safe removal and/or excision of the mesh once a complication occurs.

62.   The Mesh Product is also defective due to Defendant's failure to adequately warn or instruct Plaintiff and/or her health care providers of subjects including, but not limited to, the following:

a.   The Mesh Product's propensities to contract, retract, and/or shrink inside the body;

b.   The Mesh Product's propensities for degradation, fragmentation, and/or creep;

c.   The Mesh Product's inelasticity preventing proper mating with the pelvic floor and vaginal region;

d.   The frequency and manner of mesh erosion or extrusion;

e.   The risk of chronic inflammation resulting from the Mesh Product;

f.   The risk of chronic infections resulting from the Mesh Product;

g.   The risk of permanent vaginal or pelvic scarring as a result of the Mesh Product;

h.   The risk of de novo urinary dysfunction;

i.   The risk of de novo dyspareunia or painful sexual intercourse resulting from the Mesh Product;

j.   The risk of recurrent, intractable pelvic pain from muscle injury, irritation, nerve injury, or other pain resulting the Mesh Product;

17



k.  The need for corrective or revision surgery to adjust or remove the Mesh Product, which in some cases is neither feasible nor possible;

l.  The risk of ongoing, intractable pain from muscle injury or irritation or nerve injury or irritation and other pain that persist after attempted surgical removal of the Mesh Product;

m.  The severity of complications that could arise from implantation of the Mesh Product, both acutely after implantation and those that occur overtime;

n.  The hazards associated with the Mesh Product, including obturator and pudendal neuralgia, permanent nerve damage, pelvic floor and groin myalgia and painful bladder filling;

o.  The Mesh Product's defects described herein;

p.  Treatment of stress urinary incontinence with the Mesh Product is no more effective than feasible available alternative procedures and feasible available designs;

q.  Treatment of stress urinary incontinence with the Mesh Product makes future surgical repair more difficult than feasible available alternative procedures and feasible available designs;

r.  Treatment of stress urinary incontinence with the Mesh Product exposes patients to greater risk than feasible available alternative procedures and feasible available designs;

s.  Use of the Mesh Product puts the patient at greater risk of requiring additional surgery than feasible available alternative procedures and feasible available designs;

t.  Removal of the Mesh Product due to complications may involve multiple surgeries due to complications may involve multiple surgeries and may significantly impair the patient's quality of life and may not be successful in the treatment of chronic intractable pain from muscle damage or irritation or from nerve damage or irritation;



**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

u.   Complete removal of the Mesh Product may not be possible and may not result in complete resolution of the complications, including pain; and

v.   The nature, magnitude, and frequency of the complications that patients, such as Plaintiff Sarah Palleson, risk as a result of the Mesh Product device implantation.

63.   Defendant underreported and continues to underreport information about the propensity of their products, including the Mesh Product, to fail and cause injury and complications, and have made unfounded representations regarding the efficacy and safety of the Mesh Product through various means and media.

64.   Defendant failed to perform proper and adequate testing and research in order to determine and evaluate the nature, magnitude, and frequency of the risks attendant to the Mesh Product.

65.   Defendant failed to design and establish a safe, effective procedure for removal of the Mesh Product, or to determine if a safe, effective procedure for removal of the Mesh Product exists.

66.   Feasible and safer alternative designs and feasible and safer alternative procedures to the Mesh Product have existed at all times relevant that do not present the same frequency or severity of risks as do the Mesh Product.

67.   The Mesh Product was at all times utilized and implanted in a manner intended and foreseeable to Defendant, as Defendant generated the instructions for use, created the procedures for implanting the devices, and trained implanting physicians.

68.   Defendant knowingly provided incomplete and insufficient training and information to physicians regarding the use of the Mesh Product and the aftercare of patients implanted with the Mesh Product.

69.   The Mesh Product implanted in Plaintiff was in the same or substantially similar condition as it was when it left Defendant's possession, and in the condition directed by and expected by Defendant.



**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

70.    The injuries, conditions, and complications suffered by Plaintiff, and numerous women around the world who have been implanted with the Mesh Product include, but are not limited to, erosion, mesh contraction, infection, fistula, inflammation, scar tissue, organ perforation, dyspareunia (pain during sexual intercourse), urinary dysfunction, blood loss, neuropathic and other acute and chronic nerve damage and pain, pudendal nerve damage or irritation, obturator nerve damage or irritation, pelvic floor damage or irritation to soft tissues including muscles, and chronic pelvic pain from muscle damage and irritation, and chronic pain from nerve damage and irritation, emotional distress and mental anguish, and other debilitating complications that impair mobility, sitting tolerance, bowel and bladder function, and sexual function.

71.    In addition, affected women, including Plaintiff, will require continuous monitoring and treatment as a result of the Defendant's Mesh Product implant.

72.    Monitoring procedures exist for individuals experiencing physical and mental injuries, such as Plaintiff, from mesh implanted in patients with stress urinary incontinence. The monitoring procedure has been prescribed by a qualified physician and is reasonably necessary according to contemporary scientific principles. As such, Plaintiff is entitled to future medical monitoring and treatment directly related to the existing injuries caused by the defective products.

73.    In many cases, including Plaintiff's, women have been forced to undergo extensive medical treatment including, but not limited to, operations to locate and remove mesh, operations to attempt to repair pelvic organs, tissue, and nerve damage, the use of pain control and other medications, injections into various areas of the pelvis, spine, and the vagina, and operations to remove portions of the female genitalia.

74.    The medical and scientific literature studying the effects of mesh products like the Mesh Product, the product implanted in Plaintiff, has examined each of these injuries, conditions, and complications, and has reported that they are causally related to mesh products.



**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

75.     Removal of contracted, eroded and/or infected mesh can require multiple surgical interventions for removal of mesh and results in scarring on fragile compromised pelvic tissue and muscles.

76.     At all relevant times herein, Defendant continued to promote the Mesh Product as safe and effective even when no clinical trials had been done supporting long- or short-term efficacy or safety. Plaintiff reasonably relied upon the statements of Defendant and as a reasonable consumer, Plaintiff had the right to expect that the Product would perform as promised.

77.     In doing so, Defendant failed to disclose the known risks and failed to warn of known or scientifically knowable dangers and risks associated with the Mesh Product, including the magnitude and frequency of these risks.

78.     At all relevant times herein, Defendant failed to provide sufficient warnings and instructions that would have put Plaintiff Sarah Palleson, her treating physicians, the medical community, and the general public on notice of the dangers and adverse effects caused by implantation of the Mesh Product.

79.     The Mesh Product as designed, manufactured, distributed, sold and/or supplied by Defendant was defective as marketed due to inadequate warnings, instructions, labeling and/or inadequate testing in the presence of Defendant's knowledge of lack of safety.

## **FACTS SPECIFIC TO PLAINTIFF SARAH PALLESON**

80.     Ms. Palleson was implanted with the Mesh Product on or about November 5, 2009.

81.     The Mesh Product implanted in Ms. Palleson was designed, manufactured, packaged, labeled, distributed and sold by BSC.

82.     The Mesh Product was intended to treat Ms. Palleson for stress urinary incompetence, the use for which Defendant marketed the product.

83.     Ms. Palleson's treating physicians implanted the Mesh Product properly and appropriately.



**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

84. The Mesh Product was designed to:

    a.    Be placed blindly in close proximity to the obturator nerve, causing Plaintiff's injuries, *inter alia,* symptoms of obturator neuralgia including groin pain and impairments in mobility.

    b.    Be placed blindly into the groin. This placement causes or substantially contributes to hip adductor myalgia.

    c.    Be placed blindly on or about the pelvic floor piercing muscles of the pelvic floor. This intended placement causes tension that causes or substantially contributes to pelvic floor myalgia.

    d.    Be placed on or about the pelvic floor adjacent to the vagina, the urethra, the bladder, and the rectum. This intended placement causes or substantially contributes to causing pelvic floor myalgia, painful bladder filling, chronic pelvic pain, impaired mobility, impaired sexual function, dyspareunia, impaired bladder function, recurrent infections, recurrent incontinence, impaired bowel function, and impaired mobility related to chronic inflammatory response, scar plate formation, adhesions, and erosions and migration of the Products.

    e.    Blindly place the arms of the sling into the hip adductor muscles and through the obturator foramen and does not account for anatomic variations of the pudendal nerve and obturator nerve.

85. The Defendant did not study the anatomic variations known and/or knowable for the pudendal/obturator nerve and did not disclose the risk and the magnitude of the risk of chronic life-altering pain related to injury or irritation to these nerves .

86. The Mesh Product was designed to be permanently implanted into a woman's body yet the product changes after implantation: it contracts over time which can cause fibrosis of muscles resulting in irritation or injury to muscles, adhesions and scar tissue, inflammation, and pull or compress nerves thereby impairing sexual function and mobility, and cause bowel and bladder dysfunction function, chronic pelvic pain, and chronic groin pain. These changes



**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

occurred in Plaintiff and the Mesh Product in Plaintiff was degraded on explant with findings of chronic inflammation.

87.    Ms. Palleson developed multiple medical conditions which were caused by the Mesh Product implant including, but not limited to, groin pain, pain with sitting, tailbone pain, de novo dyspareunia, pelvic pain, anorectal pain, painful bladder filling, constipation, inability to wear close fitting pants, clitoral numbness, impaired mobility, limited sitting tolerance, perineal pain, bladder outlet obstruction, urge incontinence, obstructive voiding, urinary tract infections, hematuria, and urinary incontinence.

88.    At all times material hereto, Defendant failed to comply or properly comply with state and/or Federal law in connection with the Mesh Product.

89.    The risk of serious injuries acute and those that develop overtime, including life-altering, on-going pain, was known or should have been known to Defendant, but in spite of these risks, Defendant deliberately concealed these risks and, instead, represented that the product was safe and effective and continued to market the Mesh Product for transvaginal use to physicians and patients, including Ms. Palleson and Plaintiff's healthcare providers, without adequate warnings.

90.    Ms. Palleson reasonably relied upon the representations of Defendant and had the Mesh Product implanted in her body.

91.    Had Defendant properly disclosed the risks associated with the Mesh Product, Ms. Palleson would not have used it.

92.    The injuries suffered by Ms. Palleson were caused by the wrongful acts, omissions, and fraudulent representations of Defendant.

93.    As a result of having the Mesh Product implanted in her, Plaintiff has experienced significant mental and physical pain and suffering, has sustained permanent injury. Plaintiff has experienced significant mental and physical pain and suffering, has sustained permanent injury and symptoms including, but not limited to, groin pain, pain with sitting, tailbone pain, de novo dyspareunia, pelvic pain, anorectal pain, painful bladder filling, constipation, inability to wear



**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

close fitting pants, clitoral numbness, impaired mobility, limited sitting tolerance, perineal pain, and de novo urinary urgency, bladder outlet obstruction, hematuria,  and stress incontinence.

94.     Plaintiff has undergone medical treatments and surgical procedures related to failure of the device, and will likely undergo further medical treatment and procedures, has suffered financial or economic loss, including, but not limited to, obligations for medical services and expenses, and/or lost income, and other damages.

95.     All of the physical injury and tremendous emotional distress that Ms. Palleson suffered could have been prevented if Defendant had placed the health and safety of the public, including that of Ms. Palleson, above their own profits.

### FIRST CAUSE OF ACTION
*STRICT LIABILITY – FAILURE TO WARN*

96.     Plaintiff repeats, realleges and incorporates by reference each and all of the allegations contained in paragraphs, including all subparagraphs, 1 through 95, inclusive, of this complaint, and by this reference incorporate the same into this cause of action herein.

97.     Defendant manufactured, sold and/or distributed the Mesh Product to Ms. Palleson to be used for the treatment of SUI.

98.     Defendant's manufacturing process and the raw materials used for its Mesh Product resulted in product defects.

99.     At all times mentioned herein, the Mesh Product was and is dangerous and presented a substantial danger to patients, including Ms. Palleson, who were implanted with the Product, and these risks and dangers were known or knowable at the time of distribution and implantation in Ms. Palleson. Ordinary consumers would not have recognized the potential risks and dangers the Mesh Product posed to patients with stress urinary incontinence patients because its uses were specifically promoted to improve the health of such patients. The Mesh Product was used in a way reasonably foreseeable to Defendant by Ms. Palleson. The Mesh Product was surgically place in the appropriate position in Ms. Palleson. Defendant failed to provide warnings of such risks and dangers to Ms. Palleson as described herein.



**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

100.   Ms. Palleson would not have consented to use the Mesh Product had Defendant given adequate warnings to her and her implanting physicians.

101.   As a result of the implantation of the Mesh Product, Ms. Palleson suffered debilitating injuries resulting in *inter alia* groin pain, pain with sitting, tailbone pain, de novo dyspareunia, pelvic pain, anorectal pain, painful bladder filling, constipation, inability to wear close fitting pants, clitoral numbness, impaired mobility, limited sitting tolerance, perineal pain, de novo urinary, bladder outlet obstruction, and stress incontinence, hematuria, and the need for additional surgery and future therapeutic treatments.

102.   At all times herein mentioned the Mesh Product was used in its original condition and as intended by Defendant and in a manner foreseeable to Defendant.

103.   As a result of the defective condition of the Mesh Product, namely the lack of sufficient warnings, Ms. Palleson has suffered the economic and non-economic losses in an amount to be proven at the time of trial.

104.   In doing the acts herein, the Defendant acted with oppression and/or fraud and/or malice demonstrating a conscious disregard for the rights and safety of Ms. Palleson and others. Said wrongful conduct was done with advance knowledge and or authorization and/or was ratified by an officer, director and/or managing agent of the Defendant and warrants the imposition of an award of punitive damages.

105.   As a proximate result of the Defendant's design, manufacture, labeling, marketing, sale, and distribution of the Mesh Product, Plaintiff was injured catastrophically, and sustained severe and permanent pain, suffering, disability, impairment in mobility and sexual function, impairment in bowel and bladder function, loss of enjoyment of life, loss of care, comfort, and consortium, and economic damages.

## SECOND CAUSE OF ACTION
### *STRICT LIABILITY – MANUFACTURING DEFECT*

106.   Plaintiff repeats, realleges and incorporates by reference each and all of the allegations contained in paragraphs, including all subparagraphs, 1 through 105, inclusive, of this Complaint, and by this reference incorporate the same into this cause of action herein.



**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

107.    At all times herein mentioned, Defendant's Mesh Product was prescribed and used as intended by Defendant and in a manner reasonably foreseeable to them. The Mesh Product was defective at the time of its manufacture, development, production, testing, inspection, endorsement, prescription, sale, and distribution. The properties of polypropylene mesh, especially the stiffer polypropylene mesh with small pore size used in the Mesh Product, is unsuitable for use at the time it left the possession of the Defendant. Not by way of limitation, the product differed from Defendant's intended result and intended design and specifications, and from other ostensibly identical units of the same product line.

108.    As represented by Defendant, the Mesh Product, when properly manufactured as designed and intended by Defendant is inert. The Mesh Product that was implanted in the Plaintiff was not inert, but rather contracted and degraded upon implant. As a proximate and legal result of the defective condition of the Mesh Product, Ms. Palleson was caused to suffer and will continue to suffer economic and non-economic losses in an amount to be proven at the time of trial.

109.    In doing the acts herein, the Defendant acted with oppression and/or fraud and/or malice demonstrating a conscious disregard for the rights and safety of Ms. Palleson and others. Said wrongful conduct was done with advance knowledge and or authorization and/or was ratified by an officer, director and/or managing agent of the Defendant and warrants the imposition of an award of punitive damages.

110.    As a proximate result of the Defendant's design, manufacture, labeling, marketing, sale, and distribution of the Mesh Product, Plaintiff was injured catastrophically, an sustained severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of care, comfort, and consortium, and economic damages.

//

//



**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

### THIRD CAUSE OF ACTION
### *NEGLIGENCE*

111.    Plaintiff repeats, realleges and incorporates by reference each and all of the allegations contained in paragraphs, including all subparagraphs, 1 through 110, inclusive, of this Complaint, and by this reference incorporate the same into this cause of action herein.

112.    At all times herein mentioned, Defendant, was engaged in the business of researching, manufacturing, licensing, fabricating, designing, labeling, distributing, supplying, promoting, selling, marketing, warranting, packaging and advertising the Mesh Product and/or directing Physicians and Surgeons how to use and implant the Mesh Product.

113.    Defendant owed to Plaintiff and the public a duty to act reasonably and to exercise ordinary care in pursuit of the activities mentioned above, and Defendant breached said duty of care.

114.    At all times relevant hereto, Defendant owed to Plaintiff and the public a duty to act reasonably and to exercise ordinary care with respect to the safe, legal, and proper manufacture, license, design, formulation, distribution, production, processing, assembly, testing, inspection, research, marketing, labeling, packaging, preparation for use, instruction and direction on implantation, use, issuance of warnings with respect to promotion, advertising, sale, and safety monitoring of the Mesh Product, and to adequately test and warn of the known and/or knowable risk and dangers of the Mesh Product, both before and after sale.

115.    Additionally, Defendant owed to Plaintiff and the public a duty to provide accurate, reliable, and completely truthful information regarding the safety and any dangerous propensities of the Mesh Product manufactured, used, distributed, sold, and/or supplied by it and to provide accurate, reliable, and completely truthful information regarding the failure of the Mesh Product to perform as intended or as an ordinary consumer would expect.

116.    At all times relevant hereto, Defendant breached the aforementioned duties in that it negligently and carelessly manufactured, fabricated, designed, licensed, produced, compounded, assembled, inspected or failed to inspect, tested or failed to test, warned or failed to warn of the health hazards, labeled, distributed, handled, used, supplied, sold, marketed,

27



warranted, packaged, promoted, advertised, instructed on the manner and method of implantation and surgery, the Mesh Product in that said Mesh Product caused, directly and proximately, the injuries of Ms. Palleson through failure of the Mesh Product to perform as intended or as an ordinary consumer would expect.

117.    Defendant's manufacturing process and the raw materials used for the Mesh Product resulted in product defects.

118.    The acts of Defendant constitute violations of the duty of ordinary care and skill owed by Defendant to Ms. Palleson and/or her physicians.

119.    Plaintiff used, handled, or was implanted with Defendant's Mesh Product referred herein in a manner that was intended and reasonably foreseeable by Defendant.

120.    As the direct and proximate result of Defendant's breach of its aforementioned duties with respect to the Mesh Product, Ms. Palleson suffered the economic and non-economic losses in an amount to be proven at the time of trial.

121.    In doing the acts herein, the Defendant acted with oppression and/or fraud and/or malice demonstrating a conscious disregard for the rights and safety of the Plaintiff and others. Said wrongful conduct was done with advance knowledge and or authorization and/or was ratified by an officer, director and/or managing agent of the Defendant and warrants the imposition of an award of punitive damages.

122.    As a proximate result of the oppression and/or fraud and/or malice demonstrating a conscious disregard for the rights and safety of the Plaintiff and other, Plaintiff was injured catastrophically, an sustained severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of care, comfort, and consortium, and economic damages.

### FOURTH CAUSE OF ACTION
***NEGLIGENT MISREPRESENTATION***

123.    Plaintiff repeats, re-alleges and incorporates by reference each of the for each and all of the allegations contained in paragraphs, including all subparagraphs, 1 through 122, inclusive, of this Complaint, and by this reference incorporates the same into this cause of action herein.



**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

124.    Defendant had a duty to accurately and truthfully represent to the medical and healthcare community, to Plaintiff Sarah Palleson, her physicians and her other healthcare providers, and to the public that the Defendant's Product had been tested and had been determined to be safe and effective for treating stress urinary incontinence. Defendant's representations of safety and effectiveness as to their Product were false.

125.    From the time that the Mesh Product was first tested, studied, researched, first manufactured, marketed and distributed, up to the present, Defendant made false representations concerning the Mesh Product and its related procedures to Ms. Palleson, her prescribing physicians and healthcare providers, the medical, scientific, pharmaceutical and healthcare communities, and the public in general.

126.    Defendant failed to exercise ordinary care in its representations concerning its Mesh Product because Defendant negligently concealed, omitted and misrepresented the Mesh Product's high risk of unreasonable, dangerous, adverse side effects.

127.    The misrepresentations included, but were not limited to, the misrepresentation that the Mesh Product was inert, safe, fit, effective, permanent, would not cause inflammatory responses or infections, would not migrate and would not result in neuropathic chronic life-altering pain and other acute and chronic nerve damage and pain for the treatment of stress urinary incontinence.

128.    At all times relevant hereto, Defendant conducted a sales and marketing campaign to promote the sale of the Product and willfully deceived Ms. Palleson, her prescribing physicians and healthcare providers, the medical, scientific, pharmaceutical and healthcare communities, and the public in general as to the health risks and consequences of the use of the Mesh Product including but not limited to making the false representations as outlined in the preceding paragraph.

129.    Defendant made the foregoing misrepresentations without any reasonable ground for believing them to be true. These misrepresentations were made directly by Defendant, its sales wholesalers, distributors, representatives, detail persons and other authorized agents of said Defendant, and in publications and other written materials directed to Ms. Palleson, her



**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

prescribing physicians and healthcare providers, the medical, scientific, pharmaceutical and healthcare communities, and the public in general with the intention of inducing reliance and the purchase and implantation of the Mesh Product.

130.    Defendant knew, or should have known, that the Mesh Product had been insufficiently tested, or had not been tested at all, lacked adequate and accurate warnings, and created a high risk, or higher than acceptable risk, or higher than reported and represented risk, of adverse side effects, including, but not limited to, erosion of the vaginal wall and other tissues, infection, acute and chronic muscle and soft tissue injury, acute and chronic nerve injury or irritation, and permanent and substantial physical injury and deformity, impaired bladder and bowel function, and  loss of the ability to perform sexually.

131.    The foregoing representations by Defendant about its Mesh Product were false in that the Mesh Product is not, and at all relevant times alleged herein was not, inert, safe, fit, effective, or permanent, would not cause chronic ongoing inflammatory responses or infections, would not migrate and would not result in neuropathic and other acute and chronic nerve damage or irritation and acute and chronic pain for the treatment of stress urinary incontinence.

132.    When used for treatment of stress urinary incontinence, indeed, the use of the Mesh Product is hazardous to health, and the Mesh Product has a significant propensity to cause serious injuries to users including, but not limited to, the injuries suffered by Ms. Palleson as described herein. The foregoing misrepresentations by Defendant was made with the intention of inducing reliance and inducing the purchase and implantation of the Mesh Product.

133.    In reliance on the misrepresentations of Defendant, Plaintiff and her prescribing physicians and healthcare providers were reasonably induced to purchase and use the Product. If they had known of the true facts and the facts concealed by Defendant, they would not have used the Mesh Product. Their reliance upon Defendant's misrepresentations was justified because such misrepresentations were made and conducted by individuals and entities that were in a position to know the true facts.

134.    Ms. Palleson reasonably relied upon the representations of Defendant and had the Mesh Product implanted in her body.



**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

135.   Had Defendant properly disclosed the risks and the magnitude of risk including life-altering pain associated with the Mesh Product, Ms. Palleson and her physicians would not have used it.

136.   Had Defendant properly disclosed the risks and the magnitude of risk including life-altering pain associated with the Mesh Product compared with safer alternative procedures and safer alternative designs, Ms. Palleson and her physicians would not have used it.

137.   As a result of Defendant's false misrepresentations as set forth above, Plaintiff sustained both economic and non-economic injuries in an amount to be proven at the time of trial.

138.   In doing the acts herein, the Defendant acted with oppression and/or fraud and/or malice demonstrating a conscious disregard for the rights and safety of the Plaintiff and others. Said wrongful conduct was done with advance knowledge and or authorization and/or was ratified by an officer, director and/or managing agent of the Defendant and warrants the imposition of an award of punitive damages.

139.   As a proximate result of the negligent misrepresentation, Plaintiff was injured catastrophically, sustained severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of care, comfort, and consortium, and economic damages.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment against Defendant as follows:

1.   For past and future economic/special damages in an amount which will conform to proof at time of trial;

2.   For past and future non-economic and general damages, according to proof at the time of trial;

3.   For punitive and exemplary damages in an amount to be determined at trial;



**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

4.    For injunctive relief, enjoining Defendant from the acts of unfair competition and untrue and misleading advertising; and

5.    For such other and further relief as the Court may deem just and proper, including costs and prejudgment interest.

DATED:  June 1, 2021            **DOLAN LAW FIRM, PC**

By: _____
Christopher B. Dolan, Esq.
Lourdes DeArmas, Esq.
Taylor French, Esq.
Attorneys for Plaintiff,
Sarah Palleson

### **JURY DEMAND**

Plaintiff demands a trial by jury on all causes of action which may be tried by a jury.

DATED:  June 1, 2021            **DOLAN LAW FIRM, PC**

By: _____
Christopher B. Dolan, Esq.
Lourdes DeArmas, Esq.
Taylor French, Esq.
Attorneys for Plaintiff,
Sarah Palleson



**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**